Alfred **FERRERI**

v.

**FIRST OPTIONS OF CHICAGO, INC.**

No. 85–2098.

United States District Court,
E.D. Pennsylvania.

Dec. 4, 1985.

---

Abraham C. Reich, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for plaintiff.

Helen C. Pudlin, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for defendants.

## MEMORANDUM AND OPINION

KATZ, District Judge.

### INTRODUCTION

Plaintiff Alfred Ferreri brought this action to recover damages for trading losses he sustained on the Philadelphia Stock Exchange as a limited partner in a market making firm called Idraniam Trading Partners. The defendant, First Options of Chicago, Inc. ("First Options"), has filed a motion to compel the arbitration of Ferreri's claims in accordance with section 4[1] of the Federal Arbitration Act, 9 U.S.C.

---

1. Section 4 of the Federal Arbitration Act states:

"A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be at issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury finds that no agreement in writing for arbitration was made or that there was no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof." 9 U.S.C. § 4.

§§ 1–14 as well as for a stay of proceedings pending arbitration in accordance with section 3 [2] of the Act. First Options claims that the provisions of a Market Maker's Agreement which was signed by Ferreri's general partner, Andrew Mainardi, III, govern this matter.

For the reasons outlined below, the motion of First Options to compel arbitration and for a stay of proceedings pending arbitration are held in abeyance, pending a jury trial as to whether there was a meeting of the minds between the parties to arbitrate this dispute.

*Procedural History*

On April 19, 1984, Mr. Ferreri filed a summons in the Court of Common Pleas of Philadelphia County against First Options, seeking to take discovery of First Options to enable him to prepare a complaint, in accordance with Rule 4007.1(c) of the Pennsylvania Rules of Civil Procedure.

In the Court of Common Pleas, First Options argued in part that it had no obligation to proceed with any discovery because Mr. Ferreri allegedly was obligated to arbitrate the dispute. By Order dated July 24, 1984, the Court overruled the objections of First Options and compelled it to comply with Mr. Ferreri's discovery requests. After the Court's Order of July 24, 1984, limited discovery was taken.

On March 25, 1985, Mr. Ferreri filed his complaint in the Court of Common Pleas of Philadelphia County. On April 15, 1985, First Options removed the action to this Court pursuant to 28 U.S.C. §§ 1441, 1446. This Court has original jurisdiction of this action because of the diversity of citizenship of the parties. 28 U.S.C. § 1332.[3]

First Options filed a motion to compel arbitration and for a stay of proceedings pending arbitration. Mr. Ferreri refused the arbitration demand of First Options and opposed the motion of First Options to stay proceedings.

In his brief in opposition to the motions of First Options, Mr. Ferreri argued that he could not be compelled to arbitrate the claims because he did not sign the Market Maker's Agreement containing the provision relating to arbitration and because his general partner, who had signed that agreement, did not have the authority to do so on Mr. Ferreri's behalf. In conference, Mr. Ferreri's counsel also asserted that the arbitration provision in the Market Maker's Agreement was inapplicable because Mr. Ferreri had a personal account with First Options that was not part of the partnership account and thus was not covered by the Market Maker's Agreement. I ordered discovery on these issues and denied the motion of First Options with leave to renew at the close of discovery. Discovery having been completed, First Options has now renewed its motion to compel arbitration and for a stay of proceedings pending arbitration.

Mr. Ferreri again opposes this motion on the grounds that he never entered into an arbitration agreement with First Options, nor did he authorize Mr. Mainardi or anyone else to enter into such an agreement on his behalf. Mr. Ferreri has filed a demand for a jury trial on the issue of the making of an arbitration agreement, as is his right under § 4 of the Federal Arbitration Act. Affidavit of Alfred Ferreri in Opposition to Motion of First Options of Chicago, Inc. for Stay of Proceedings Pending Arbitration, at ¶ 19.

---

**2.** Section 3 of the Federal Arbitration Acts provides as follows:

"If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties

stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3.

**3.** Mr. Ferreri is a resident and citizen of Pennsylvania. First Options is a Delaware corporation with its principal place of business in Illinois.

*The Record "Facts" at This Stage* [4]

At all times material to this action, Mr. Ferreri, a retired podiatrist, had no source of income other than the savings and investments he had accumulated over the course of his lifetime.

In the fall of 1982, Mr. Ferreri was introduced to Christian Huber, Jr., who at the time was a vice-president of First Options. On a number of occasions during the latter part of 1982 and the beginning of 1983, Mr. Huber tried to solicit Mr. Ferreri to become a customer of First Options as a "market maker".[5] Mr. Ferreri expressed concern to Mr. Huber about becoming a market maker because he was living on a fixed income and did not want to jeopardize his life savings. Mr. Ferreri also was uneasy about the complexity of the activities of market makers. Mr. Huber told Mr. Ferreri that his concerns could be met by becoming a limited partner with a market maker. Mr. Huber suggested that Mr. Ferreri attend a series of seminars sponsored by First Options. At these seminars Mr. Ferreri met Andrew Mainardi, III, who at the time was a market maker and customer of First Options.

Mr. Huber made various representations to Mr. Ferreri concerning Mr. Mainardi. He told Mr. Ferreri that Mr. Mainardi was an experienced market maker who knew what he was doing; that Mr. Mainardi was a conservative investor who was less oriented toward taking risks than other market makers; that Mr. Ferreri would be exposed to very limited risks if he entered into a partnership with Mr. Mainardi; and that the proposed partnership could be positioned to yield an annual profit of approximately $200,000. Through these represen-

tations, Mr. Huber convinced Mr. Ferreri to become associated with Mr. Mainardi.

In the latter part of May, 1983, Mr. Huber asked Mr. Ferreri to show him evidence of his stock portfolio, which Mr. Ferreri maintained at another brokerage house. At that time his account at the other brokerage house had a net equity of approximately $375,000.

To initiate the limited partnership, Mr. Huber directed Mr. Ferreri to transfer his securities to an account at First Options. Mr. Ferreri agreed to transfer his securities to First Options based upon an oral understanding he had with Mr. Huber. Under the terms of this oral contract, Mr. Huber agreed to do the following:

(a) Monitor Mr. Ferreri's account on a daily basis to be sure that his securities would not be at jeopardy;

(b) Not allow more than $200,000 in equity in Mr. Ferreri's account to be used for transactions in the partnership account;

(c) Not allow Mr. Mainardi to engage in trading which was inconsistent with Mr. Ferreri's objectives;

(d) Not allow more than $2500 to be withdrawn from Mr. Ferreri's account without the joint signatures of Mr. Ferreri and Mr. Mainardi; and

(e) Send Mr. Ferreri, while he was out of Philadelphia, periodic reports on the status of his account.

At or about the time that Mr. Ferreri transferred his securities to First Options, Mr. Huber asked him to sign certain forms. When Mr. Ferreri asked about the nature of the forms, Mr. Huber told him not to worry about them: the forms would not

---

**4.** The Court has compiled these "facts" from Mr. Ferreri's complaint and from an affidavit Mr. Ferreri submitted in support of his earlier memorandum in opposition to First Options' motion to compel arbitration. It does so in accordance with the directive of the Court in *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.,* 636 F.2d 51 (3d Cir.1980). In *Par-Knit* the Court outlined the method by which a court should review a motion to compel arbitration:

"The district court, when considering a motion to compel arbitration which is opposed

on the ground that no agreement to arbitrate had been made between the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise." 636 F.2d at 54 (footnote omitted). As the court noted, this standard is the same as that district courts use to resolve motions for summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure. *Id.* at 54 n. 9.

**5.** A market maker is someone who trades securities for his own account.

affect the understanding the two had and were only necessary to process paper work with the Philadelphia Stock Exchange. Mr. Ferreri never received copies of these forms. One of these forms allegedly is a partnership resolution authorizing Mr. Mainardi to make agreements on behalf of the partnership and to deal with First Options on behalf of the partnership account "as fully and completely as if he alone were interested in said account." Deposition of Alfred Ferreri, Exhibit 4.

On or about June 17, 1983, Mr. Ferreri and Mr. Mainardi executed a limited partnership agreement. The partnership agreement states that the "partnership shall engage in the business of acting as brokers and dealers in, and of, buying, selling, trading, holding and otherwise dealing in stocks, bonds, options and other securities." Deposition of Alfred Ferreri, Exhibit 1, at ¶ 3. The role of each partner is outlined in the agreement as follows:

> "ANDREW MAINARDI, III as general partner shall devote his whole time exclusively to the management and conduct of the partnership business. ALFRED FERRERI, as limited partner, is making a capital contribution to the partnership and desires to limit his liability in the partnership to the amount of his investment." *Id.* at ¶ 6.

The agreement also gives Mr. Mainardi the power to issue partnership checks. *Id.* at ¶ 11. While the limited partnership agreement apparently makes Mr. Mainardi the managing partner of the firm, the agreement contains no provisions relating directly to his power to submit partnership claims to arbitration.

On or about July 1, 1983, Mr. Ferreri and Mr. Mainardi executed an amendment to the limited partnership agreement. The amendment contemplates that the partners would establish a separate customer account for Mr. Ferreri's securities and placed restrictions on Mr. Mainardi's use of these securities. Deposition of Andrew Mainardi, III, Exhibit 2.

On June 30, 1983, Mr. Mainardi, on behalf of the partnership, entered into a Mar-

ket Maker's Agreement with First Options. Under that agreement, First Options agreed to carry the partnership's account. Paragraph 21 of the Market Maker's Agreement contains the provisions upon which First Options relies to compel arbitration. It reads in pertinent part as follows:

> "It is agreed that any controversy between us arising out of the undersigned's business or this agreement, whether arising before or after the date hereof, shall be submitted to and determined by arbitration under the provisions of the Constitution and Rules of Chicago Board Options Exchange, Inc. or other national securities exchange or pursuant to the Code of Arbitration of the National Association of Security Dealers, as the undersigned may elect."

Mainardi Deposition, Exhibit 4, at ¶ 21. Mr. Ferreri never signed the Market Maker's Agreement and alleges that he never saw a copy of the agreement until after this litigation was instituted.

On or about July 1, 1983, Mr. Mainardi began to trade on behalf of the partnership. At about that time, Mr. Ferreri informed Mr. Huber that he would be out of Philadelphia for the summer. He again requested assurances from Mr. Huber that Mr. Huber would monitor his account daily, that Mr. Mainardi would be permitted to engage only in conservative option transactions and that no more than $200,000 of equity in his security account would be used for the partnership. Mr. Huber again agreed to these conditions and stated that he would send Mr. Ferreri, at his out-of-town address, periodic reports of the transactions in his account.

The partnership was not a success. On August 9, 1985, after the partnership failed to meet a margin call, First Options liquidated the partnership account, including all of Mr. Ferreri's securities.

*The Complaint*

Mr. Ferreri has filed this action on his own behalf. He is not seeking relief on

behalf of the limited partnership or on behalf of his general partner, Mr. Mainardi.

Mr. Ferreri's complaint is comprised of six counts. Count one alleges fraudulent conduct on the part of First Options against Mr. Ferreri. Count two is a claim against First Options based on negligent representation to Mr. Ferreri. Count three alleges that First Options breached an oral agreement with Mr. Ferreri. Count four alleges that First Options breached a fiduciary duty to Mr. Ferreri. Count five alleges that First Options breached an agency relationship with Mr. Ferreri, and count six alleges that the action of First Options against Mr. Ferreri violated the Pennsylvania Securities Act of 1972, 70 P.S. § 1–101 *et seq.*

Mr. Ferreri is seeking compensatory and punitive damages from First Options, as well as an accounting for any profits generated by First Options when it liquidated the partnership account.

*Application of the Federal Arbitration Act*

The Federal Arbitration Act is applicable to this case. I will first make a finding that this transaction was in interstate commerce for purposes of the Federal Arbitration Act. *See Goodwin v. Elkins & Co.,* 730 F.2d 99, 108–09 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 118, 83 L.Ed.2d 61 (1984); *Stateside Machinery Co., Ltd. v. Alperin,* 591 F.2d 234, 238–39 (3d Cir.1979); *Gavlick Construction Co. v. H.F. Campbell Co.,* 526 F.2d 777, 784 (3d Cir.1975); *Merritt-Chapman & Scott Corp. v. Pennsylvania Turnpike Commission,* 387 F.2d 768, 772 (3d Cir.1967). Section 2 of the Act provides that the scope of the Act embraces contracts "evidencing a transaction involving commerce." 9 U.S.C. § 2. Commerce, as used in this provision, is defined by Section 1 of the Act to include "commerce among the several states...." 9 U.S.C. § 1.

█ The phrase, "involving commerce," as used in Section 2, which determines the scope of the Act, is not to be construed narrowly. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395,

401–02 n. 7, 87 S.Ct. 1801, 1804–05, 18 L.Ed.2d 1270 (1967); *Fairchild & Co., Inc. v. Richmond, Fredericksburg & Potomac Railroad Co.,* 516 F.Supp. 1305, 1310 (D.D. C.1981). The Court in *Prima Paint* noted that Congress indicated in the legislative history of the Act that, " 'commerce reaches not only the actual physical interstate shipment of goods, but also contracts relating to interstate commerce.' " *Id.* (quoting H.R.Rep. No. 96, 68th Cong., 1st Sess. 1 (1924)). The Supreme Court has suggested the broad interpretation that a contract evidences a transaction involving commerce within the meaning of Section 2 of the Act where contractual activity facilitates interstate commercial transactions, *id.,* or where it affects commerce. *Bernhardt v. Polygraphic Co.,* 350 U.S. 198, 201, 76 S.Ct. 273, 275, 100 L.Ed. 199 (1956). The district court in *Fairchild* noted that a number of courts have also used this broad "affecting commerce" language to describe contracts evidencing transactions involving commerce. *Fairchild & Co., Inc. Richmond Fredericksburg & Potomac Railroad Co., supra,* 516 F.Supp. at 1310 (and cases cited therein).

█ I find that the conduct contemplated by the Market Maker's Agreement was a contract "involving commerce" within the meaning of Section 2 of the Arbitration Act.

Mr. Mainardi and Mr. Ferreri formed their partnership in order to "engage in the business of acting as brokers and dealers in, and of buying, selling, trading, holding and otherwise dealing in stocks, bonds, options and other securities." Ferreri Deposition, Exhibit 1, at ¶ 3. Because the partnership did not have the facilities to clear its own trades, it was required to open an account with one of the options clearing houses offering such services—in this case, First Options. The Market Maker's Agreement between First Options and the partnership established a customer account for the partnership at First Options. The Agreement contemplates that the partnership will be buying and selling various se-

curities. Establishing a customer account, then, affected commerce since it facilitated the trading of securities on the Philadelphia Stock Exchange. *See Prima Paint Corp. v. Flood & Conklin Mfg. Company, supra,* 388 U.S. at 401–02 n. 7, 87 S.Ct. at 1804–05; *Bernhardt v. Polygraphic Co., supra,* 350 U.S. at 201, 76 S.Ct. at 275.

*Federal Policy Favors Enforcing Private Agreements To Arbitrate*

In recent years, the Supreme Court has applied a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). The Supreme Court has noted that Section 2 of the Act "and the Act as a whole, is at bottom a policy guaranteeing the enforcement of private contractual arrangements: the Act simply 'creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate.'" *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* —— U.S. ——, 105 S.Ct. 3346, 3353–54, 87 L.Ed.2d 444 (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* supra, 460 U.S. at 25 n. 32, 103 S.Ct. at 942). Congress' principal concern in passing the Act was "'to enforce private agreements into which parties had entered,' a concern which 'requires federal courts to enforce agreements to arbitrate vigorously.'" *Id.* 105 S.Ct. at 3354 (quoting *Dean Witter Reynolds, Inc. v. Byrd,* —— U.S. ——, 105 S.Ct. 1238, 1243, 84 L.Ed.2d 158 (1985).

The Court in *Mitsubishi* also noted that when a district court is asked to compel arbitration of a dispute, it must "determine whether the parties agreed to arbitrate the dispute. The court is to make that determination by applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.' *Id.* (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp., supra* 460 U.S., at 24, 103 S.Ct. at 941). That body of law establishes that a district court should resolve any doubts concerning the *scope* of arbitrable issues in favor of arbitration. *Moses H. Cone Memorial Hospital, supra,* 460 U.S. at 24–25, 103 S.Ct. at 941–42. As in other contract litigation, the intentions of the parties control, "but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,* 105 S.Ct. at 3354.

*Meeting Of Minds On Agreement To Arbitrate Disputes In Question*

The Federal Arbitration Act, then, "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd,* —— U.S. ——, 105 S.Ct. 1238, 1243, 84 L.Ed.2d 158 (1985) (emphasis in original). But this mandate arises only *after* the district court has determined that the parties have agreed to arbitrate their disputes. Section 4 of the Act directs the district court to order the parties to arbitrate only "upon being satisfied that the making of the agreement for arbitration ... is not in issue...." 9 U.S.C. § 4. Should the district court find that the making of the arbitration agreement is at issue, "the court shall proceed immediately to the trial thereof." *Id.*

■ Mr. Ferreri has, indeed, placed the making of the arbitration agreement in issue. He claims that he is not a party to the Market Maker's Agreement and that he never saw a copy of that Agreement, which contains the arbitration clause in question, before the onset of this litigation. Ferreri Affidavit, at ¶ 13. He claims that no one at First Options informed him that he would be required to arbitrate disputes; nor did his partner, Mr. Mainardi, tell him that he would be required to arbitrate disputes with First Options. Ferreri Affidavit, at ¶ 14–15. Finally, Mr. Ferreri alleges that he never gave Mr. Mainardi the authority to bind him to arbitrate any disputes that he had with First Options. Ferreri Affidavit, at ¶ 18.

The criteria for resolving the issue of whether there was a meeting of the minds with respect to arbitration were set forth in *Par-Knit Mills, Inc. v. Stockbridge Fab-*

*rics Co.,* 636 F.2d 51 (3d Cir.1980). In *Par-Knit,* the buyer's production manager signed a contract for the sale of goods that had previously been reviewed by the highest ranking official at the buyer's plant. The contract contained an arbitration provision, which the seller sought to enforce when a dispute between the parties arose. The buyer sought to avoid arbitration and claimed that there had been no meeting of minds on the issue of arbitration. The buyer also asserted that the production manager lacked the authority to bind the buyer to the arbitration provision.

*Par-Knit* held that a party should be "deprived of a day in court" only when there is an "express, unequivocal agreement" to arbitrate disputes. 636 F.2d at 54. Compelling a party to arbitrate a dispute was appropriate "[o]nly when there is no genuine issue of fact concerning the formation of the agreement...." *Id.* A district court should give the party opposing arbitration "the benefit of all reasonable doubts and inferences that may arise." *Id.*[6]

To withstand a motion to compel arbitration, an "unequivocal denial that the agreement had been made, accompanied by supporting affidavits, ... in most cases should be sufficient to require a jury determination on whether there had in fact been a 'meeting of the minds.' " *Id.* at 55 (citation omitted).

In *Par-Knit,* the court remanded the case for a jury trial on the "meeting of the minds" issue, noting with regard to the authority of the production manager to bind the buyer-corporation:

"If the production manager did not have the actual or apparent authority to execute the contract, the corporation cannot be bound, no matter how clearly the document was labeled." *Id.*

In the instant litigation, Mr. Ferreri has unequivocally denied that an agreement to arbitrate was made and has submitted an affidavit in which he denies that he gave Mr. Mainardi, his partner, the authority to

bind him to arbitrate disputes with First Options. This, according to the *Par-Knit* court, is sufficient in most cases to require a jury trial on whether there was a meeting of the minds to arbitrate. However, the additional discovery that was taken in this matter shows that a jury trial is needed to resolve this issue.

In his deposition, Mr. Mainardi, who signed the agreement on behalf of Mr. Ferreri's partnership, stated that as general partner of Idraiam Trading Partners he had the authority to enter into the Market Maker's Agreement on behalf of the partnership and Mr. Ferreri. Deposition of Andrew Mainardi, III, at 14–18. He believed that this authority extended to the power to agree to the arbitration provision. *Id.* at 16–18. However, he was surprised to learn that the Agreement contained an arbitration provision. *Id.* at 16–17.

The deposition of Mr. Huber, who executed the Agreement on behalf of First Options, also shows that there is a factual issue as to whether there was a meeting of the minds about arbitration.

Mr. Huber, prior to the execution of the Agreement, never discussed the arbitration clause with either Mr. Ferreri or Mr. Mainardi. Deposition of Christian Huber, Jr., at 23. Nor did he make any inquiries as to whether Mr. Mainardi had the authority to agree to arbitrate any disputes that might arise in connection with the opening of the account. *Id.* at 45–46. However, he believed that Mr. Mainardi had the authority to sign the agreement on behalf of Mr. Ferreri and the partnership. *Id.* at 14.

Mr. Ferreri, for his part, acknowledged in his deposition that Mr. Mainardi was authorized to open the market maker account on behalf of the partnership (Deposition of Alfred Ferreri, at 66), but *denied* that Mr. Mainardi had the power to submit disputes to arbitration.

The arbitration provision was vital to the agreement between the parties. First Options states that without the arbitration

---

**6.** As the court noted, this standard is the same as that district courts use to resolve motions for

summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure. *Id.* at 54 n. 9.

provision "First Options would not have permitted the account to be opened." Memorandum in Support of the Motion of First Options of Chicago, Inc. to Compel Arbitration, at 8. First Options also submitted the affidavit of Raymond L. Aronson, Associate Director of the Legal and Compliance Department of Bear, Stearns & Co., a securities broker, to support its contention that "it is customary in the industry for account agreements to be signed by the general partner of a limited partnership on behalf of the partnership and all partners and for such agreements to contain arbitration requirements." *Id.* at 10.

First Options appears to miss the point. The issue is not whether such agreements *customarily* contain arbitration provisions or whether First Options *customarily* relies on the authority of the general partner of a limited partnership to bind the other partners and the partnership to the arbitration provision. Rather, the issue is "whether the facts and circumstances surrounding the formation of the document demonstrate that there was mutual assent to arbitration." *Okcuoglu v. Hess, Grant & Co., Inc.*, 580 F.Supp. 749, 750 (E.D.Pa. 1984). On the record before me, there is a genuine issue of material fact as to whether these parties agreed to arbitrate. *Par-Knit*, 636 F.2d at 54.

First Options attempts to distinguish this case from *Par-Knit* because of the difference in authority between a production manager in a corporation and a general partner in a limited partnership.[7] How-ever, the authority of a general partner with respect to submitting firm disputes to arbitration is not as clear as First Options would have it.

█ It is true that the authority to manage the partnership business carries with it the authority "to make contracts which are incidental to such business, are usually made in it, or are reasonably necessary in conducting it ... and ... to direct the ordinary operations of the business." *Restatement (Second) of Agency* § 73; 68 C.J.S. § 141, at 576–77. Such authority would extend to binding the partners and the partnership to contracts in the usual form containing the usual terms. *Restatement (Second) of Agency* § 51(a). There is no question that entering into the Market Maker's Agreement with First Options was incidental if not necessary to conduct the partnership business. Nor is there any dispute that the contract was in standard form and contained the usual terms. The problem concerns the general partner's power to submit these disputes to arbitration.

Mr. Ferreri and Mr. Mainardi's partnership, Idraniam Trading Partners,[8] was a limited partnership. Under the Uniform Limited Partnership Act of 1916, a general partner in a limited partnership has "all the rights and powers and [is] subject to all the restrictions and liabilities of a partner in a partnership without limited partners...." Uniform Limited Partnership Act of 1916, § 9(1).[9] Since a general partner in a limit-

---

7. Mr. Ferreri has argued that he cannot be bound to arbitrate this dispute since he was not a party to the Market Maker's Agreement. That agreement he maintains, was between First Options, Mr. Mainardi and Idraniam Trading Partners. However, "a variety of non-signatories of arbitration agreements have been held to be bound by such agreements under ordinary common law contract and agency principles." *Barrowclough v. Kidder, Peabody & Co., Inc.*, 752 F.2d 923, 938 (3d Cir.1985) (and cases cited therein). Such non-signatories have included partners. *See Hartford Financial Systems, Inc. v. Florida Software Services, Inc.*, 550 F.Supp. 1079, 1086–87 (D.Me.1982), *appeal dismissed*, 712 F.2d 724 (1st Cir.1983); *Wydel Associates v. Thermasol, Ltd.*, 452 F.Supp. 739 (W.D.Tex. 1978). *Application of Camhi*, 28 Misc.2d 93, 208 N.Y.S.2d 162 (N.Y.Sup.Ct.1960), *rev'd on other grounds*, 13 A.D.2d 752, 215 N.Y.S.2d 406 (1961).

8. "Idraniam" is "Mainardi" spelled backwards.

9. The Act was revised in 1976, and the parallel provision is essentially unchanged:

> "Except as provided in the Act or in the partnership agreement, a general partner of a limited partnership has the rights and powers and is subject to the restrictions of a partner in a partnership without limited partners."

Uniform Limited Partnership Act of 1976, § 403(a).

Pennsylvania and Illinois are the two state forums with interests in this litigation. Pennsylvania is the site where the contract was exe-

ed partnership has powers similar to those of a partner in a partnership without limited partners, we then look to the Uniform Partnership Act. This Act, on its face, appears to forbid partners from submitting firm disputes to arbitration unless the other partners authorize that partner to do so.[10] Section 9(3) of the Uniform Partnership Act provides:

"Unless authorized by the other partners ..., one or more but less than all the partners have no authority to ... s]ubmit a partnership claim or liability to arbitration or reference."

Uniform Partnership Act, § 9(3).[11]

There is little authority dealing with Section 9(3) of the Uniform Partnership Act. See Wydel Associates v. Thermasol, Ltd., 452 F.Supp. 739, 741–42 (W.D.Tex.1978) (Section 9(3) clearly purports to limit the authority of partners to submit existing claims to arbitation, rather than agreements to arbitrate future disputes. In any case, plaintiff in this matter had clearly ratified the contract); Hartford Financial Systems v. Florida Software Services, Inc., 550 F.Supp. 1079, 1087 n. 12 (D.Me. 1982), appeal dismissed, 712 F.2d 724 (1st Cir.1983) (ditto); Arbitration between Baker and Board of Education of Central School District No. 2 of Towns Bath, et al., 309 N.Y. 551, 132 N.E.2d 837, 839 (N.Y.1956) (Section 9(3) prohibited submission of a dispute to arbitration by one partner only in the absence of a contract containing an arbitration clause); Stein-

Tex, Inc. v. Scappatillio, 193 Misc. 402, 87 N.Y.S.2d 317 (N.Y.Sup.Ct.1948), modified on other grounds, 275 A.D. 749, 88 N.Y. S.2d 270 (N.Y.App.Div.1949) (even if partner exceeded his authority in submitting dispute to arbitration, other partners, by their conduct, gave their assent to the whole contract, including the arbitration provision).

I find that the issue turns on whether Mainardi had actual or apparent authority to agree to arbitrate these disputes. I cannot, as a matter of law, determine that Mr. Mainardi, the general partner, had actual authority to enter into the Market Maker's Agreement. That is a matter for a jury. Nor can I find that he had apparent authority to do so. That is also a matter for a jury. "[T]he existence of apparent authority turns on matters ... of a type rarely susceptible to treatment on summary judgment." Ebasco Services Inc. v. Pennsylvania Power and Light Co., 402 F.Supp. 421, 448 (E.D.Pa.1975). There is a factual issue as to whether there was any manifestation of the existence of authority to arbitrate on which defendant relied. Ferreri's version is that First Options opened the account in reliance on his oral understanding with Huber, not Mainardi's "authority." See p. 8 supra.

Because of the need for a trial to determine whether there was an agreement between the parties to arbitrate their disputes, I hold in abeyance the motion of

---

cuted and was to be performed. Illinois's interest arises from the choice-of-law provision in the Market Maker's Agreement, which provides that the agreement "shall be governed by the law of the State of Illinois...." Mainardi Deposition, Exhibit 4, at ¶ 19.

Both Pennsylvania and Illinois have enacted the provision in the 1916 Act. See 59 Pa.C.S.A. § 523(1); Ill Ann.Stat. ch. 106½, § 52(1).

**10.** Under common law, it has generally been held that a partner could not submit a firm controversy to arbitration without the authorization of his co-partners. 68 C.J.S. § 163, at 613. See Karthaus v. Yllas Y. Ferrer, 26 U.S. (1 Pet.) 222, 7 L.Ed. 121 (1828) (partner's authority extends only to submitting his own interests in the firm to arbitration—he could not, by his submission, bind his partners); Hoffman v.

Westlecraft, 85 N.J.L. 484, 89 A. 1006 (N.J.1914) (partnership agency does not extend to the submission of controversies to arbitration. The executing partner may bind himself by such submission, but he cannot bind his partners without express authority). But see Taylor v. Coryell, 12 Serg. & Rawle 243 (Pa.1824) (one partner may bind his co-partners, by an agreement not under seal, to submit partnership disputes to arbitration—to hold otherwise would be a great impediment to commercial dealing); Gay v. Waltman, 89 Pa. 453 (Pa.1879) (following Taylor v. Coryell).

**11.** Both Pennsylvania and Illinois have adopted this provision. See 59 Pa.C.S.A. § 321(c); Ill.Ann Stat. ch. 106½, § 9(3).

First Options to compel arbitration.[12] Pursuant to section 4 of the Federal Arbitration Act, the parties will proceed to trial on this issue. Mr. Ferreri has requested a trial by jury on this matter, as is his right under section 4 of the Act. Ferreri Affidavit, at ¶ 19.

The motion of First Options to stay proceedings pending arbitration will also be held in abeyance pending the results of the jury trial on the meeting of the minds issue. *See Matterhorn, Inc. v. NCR Corporation,* 763 F.2d 866, 869–70 (7th Cir. 1985) (decision that trial was necessary to resolve issue of whether parties had agreed to arbitrate disputes was not a denial of a motion to stay—such a decision is akin to a denial of a motion for summary judgment on a claim for injunction).

*Scope of the Arbitration Clause*

Since the issue is raised, I will rule now on the scope of the arbitration provision. Should the jury decide that the parties *did* agree to arbitrate their disputes, I find that the first five counts of Mr. Ferreri's complaints present issues that are arbitrable. However, plaintiff's sixth count, which sets forth a claim under the Pennsylvania Securities Act (70 P.S. §§ 1–101 *et seq.*), is not arbitrable. *See Martin v. ITM/International Trading & Marketing Ltd.,* 494 A.2d 451 (Pa.Super.Ct.1985).

The provision governing arbitration in this case is extremely broad, covering disputes that develop either before or after the date of execution of the Market Maker's Agreement. The provision requires the parties to arbitrate any controversy "arising out of the undersigned's business or this Agreement, *whether arising before or after the date hereof.*" (emphasis added). Mainardi Deposition, Exhibit 4, at ¶ 21.

■ The first five counts in Mr. Ferreri's complaint allege that First Options, in its dealings with Mr. Mainardi, committed fraud and misrepresentation as well as breached an oral contract, a fiduciary duty, and an agency relationship. In order to decide whether these counts are arbitrable, I must determine whether the arbitration provision covers the following disputes between Mr. Ferreri and First Options:

1. whether Mr. Huber misrepresented Mr. Mainardi's abilities as a market maker to Mr. Ferreri;

2. whether First Options was to establish a customer account for Mr. Ferreri's securities, separate and apart from the partnership account;

3. whether Mr. Ferreri had any oral agreements with Mr. Huber;

4. whether Mr. Huber fraudulently induced Mr. Ferreri to sign important documents concerning Mr. Ferreri's securities.

1. *Mr. Huber's misrepresentations of Mr. Mainardi's abilities as a market maker.*

In his complaint, Mr. Ferreri alleges that Mr. Huber, who was at the time a vice-president of First Options, convinced Mr. Ferreri to become a market maker and put his securities in an account at First Options by making various misrepresentations to him.

When the two first met, Mr. Ferreri expressed his concerns to Mr. Huber about risking his life savings and said that he was uneasy about the complexities of market making. Mr. Huber then told Mr. Ferreri that his concerns could be met if he became a limited partner with Mr. Mainardi. Mr. Huber represented to Mr. Ferreri that Mr. Mainardi was an experienced market maker who knew what he was doing; that Mr. Mainardi was a conservative investor who was less oriented toward taking risks than other market makers; that Mr. Ferreri would be exposed to very limited risks if he entered into a partnership with Mr. Mainardi; and that the proposed part-

---

**12.** The Court recognizes that requiring parties to submit to a trial to determine whether they had agreed to arbitrate their disputes "may run contrary to the general policy of encouraging the arbitration of disputes." *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.,* 636 F.2d 51, 55 (3d Cir.1980).

nership could be positioned to yield an annual profit of approximately $200,000. Mr. Ferreri claims that these alleged misrepresentations induced him to enter into his ill-fated partnership with Mr. Mainardi.

Though a close question, I believe the controversy arising out of these allegations falls within the scope of the arbitration clause. Admittedly, this dispute arose before the signing of the market maker's agreement; but the arbitration provision covers disputes between the parties arising before the date of the agreement if they arise out of the "undersigned's business". In this case, the undersigned was Mr. Mainardi, who signed the agreement on behalf of Idraniam Trading Partners.

Mr. Huber's representations concerning Mr. Mainardi were apparently made, in part, to solicit Mr. Ferreri as a customer of First Options. With respect to Mr. Ferreri, the result is problematical. Mr. Ferreri was not associated with market-making at the time Mr. Huber told Mr. Ferreri about Mr. Mainardi. However, Mr. Ferreri relied on these representations, which led Mr. Ferreri to become associated with Mr. Mainardi and engage in market-making activities. As I must construe the arbitration clause broadly and resolve any doubts in favor of arbitration, I find that this dispute arose out of Mr. Ferreri's business. *Stateside Machinery Co. v. Alperin*, 591 F.2d 234, 240 (3d Cir.1979).

2. *The establishment of a separate customer account for Ferreri's securities.*

Mr. Ferreri alleges that First Options was supposed to place his securities in a customer account separate and apart from whatever was supposed to be in the partnership account. According to Mr. Ferreri, the failure of First Options to set up this segregated account led to the trading losses he suffered.

Assuming, *arguendo*, that First Options was supposed to establish a separate account for Mr. Ferreri's securities, I find little difficulty in construing this dispute as falling within the scope of the arbitration

provision. The dispute concerns whether First Options wrongfully commingled assets in the customer account of the partnership with those in the segregated account set up for Mr. Ferreri. The limited partnership agreement entered into by Mr. Mainardi and Mr. Ferreri, as well as the amendment to that agreement, contemplate that Mr. Ferreri would make a contribution to capital consisting of the securities in his separate account. Mr. Ferreri acknowledges that his capital contribution was to be used as equity for the trading of the partnership:

> "My contribution to the partnership represented a certain degree of equity, and that equity represents the delivery of my stock to the customer account. The market maker was to work against that equity for his market-making activity."

Deposition of Alfred Ferreri, at 30.

Resolving this dispute involves untangling the matter of which assets go where. Such a task involves the business activities of Mr. Ferreri, as a limited partner of Idraniam Trading Partners, and of First Options as the partnership's broker. It is, thus, a matter for arbitration.

3. *The existence of an oral agreement between Mr. Ferreri and Mr. Huber.*

Mr. Ferreri alleges that he had an oral contract with Mr. Huber regarding the handling of his personal account. Under the terms of the oral contract, Mr. Huber agreed to monitor the account on a daily basis; to make sure that Mr. Mainardi did not allow Mr. Mainardi to trade in risky ventures; to refuse to let Mr. Mainardi withdraw more than $2500 from the account without the joint signatures of Mr. Ferreri and Mr. Mainardi; to refuse to allow more than $200,000 in equity in Mr. Ferreri's account to be used for transactions in the partnership account; and to send Mr. Ferreri periodic reports on the status of his account while Mr. Ferreri was away from Philadelphia.

This dispute is also within the scope of the arbitration provision. Most, if not all, of the activities Mr. Huber allegedly

agreed to perform are in connection with his "duties" as a broker for the partnership. And the information he was to provide to Mr. Ferreri related to the partnership as well as to Mr. Ferreri's personal account. As noted above, the untangling of the relationship between the partnership account and the separate account for Mr. Ferreri's securities would be a matter for the arbitrator, if the parties agreed to arbitration. Mr. Huber's alleged failure to watch out for Mr. Ferreri's well-being is no less a problem for the arbitrator.

4. *The signing of other documents relating to Mr. Ferreri's securities.*

Mr. Ferreri also alleges that Mr. Huber fraudulently induced him to sign certain forms, one of which was a partnership resolution in which Mr. Ferreri authorized Mr. Mainardi to make agreements on behalf of the partnership.

This dispute is within the scope of the arbitration provision. It does not go to the making of the arbitration agreement itself but rather is a claim of fraud in the inducement generally. Such claims are matters for arbitration. *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,* 388 U.S. 395 (1967); *Merritt-Chapman & Scott Corp. v. Pennsylvania Turnpike Commission,* 387 F.2d 768 (3d Cir.1967).

5. *Claims Brought Under The Pennsylvania Securities Act.*

▇ The last count in Mr. Ferreri's complaint states a cause of action under the Pennsylvania Securities Act, 70 P.S. §§ 1–101 *et seq.* This court's jurisdiction over the claim brought under the Act is based on diversity of citizenship and the principle of pendent jurisdiction.

First Options has moved to compel arbitration of this claim citing the Supreme Court's decision in *Dean Witter Reynolds Inc. v. Byrd,* —— U.S. ——, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). In *Dean Witter* the Court held that the Federal Arbitration Act "requires district courts to compel arbitration of *pendent arbitrable claims* when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in separate forums." 105 S.Ct. at 1241 (emphasis added).

First Options' reliance on the Supreme Court's opinion in *Dean Witter* is misplaced. I must decide whether Mr. Ferreri's state securities claims are *arbitrable.* Should I decide they are, then *Dean Witter* tells me I must compel arbitration.

However, Mr. Ferreri's claims under the Pennsylvania Securities Act are *not* arbitrable. Section 507 of that Act states:

"Any condition, stipulation or provision binding any person acquiring any security to waive compliance with any provision of this Act or any rule or order hereunder is void."

70 P.S. § 1–507.

This provision of the Act recently was held to render unenforceable an agreement to arbitrate future disputes. *Martin v. ITM/International Trading & Marketing Ltd.,* 494 A.2d 451 (Pa.Super.Ct.1985).

Since the cause of action under the Pennsylvania Securities Act is not referable to arbitration, the parties may proceed to trial on this matter. In this regard, I note that my decision is in accord with the reasoning of the recent decision in *Burke and Novak v. Latrobe Steel Co.,* 775 F.2d 88 (3d Cir. 1985), a case brought under ERISA. In that case the court concluded that an arbitration agreement "does not preclude resort to a judicial forum even though there may be a factual overlap between contractual and statutory claims." At 89. The court noted that purely statutory issues, as opposed to those that arise under a contract, "are not within the competence of an arbitrator and fall under the court's jurisdiction." *Id.* at 91. Mr. Ferreri's claims under the Pennsylvania Securities Act are statutory, not contractual claims.

Mr. Ferreri will, thus, not have to arbitrate his state-law claim, no matter the outcome of the jury trial on the "meeting of the minds" issue. In order to qualify for protection under the Pennsylvania Securities Act, Mr. Ferreri will have to show

that the Market Maker's Agreement falls within the definition of a security under section 102(t) of the Act. 70 P.S. § 1–102(t). *See Martin v. ITM/International Trading & Marketing Ltd.,* 494 A.2d 451 (Pa.Super. Ct.1985).

Mr. Ferreri can only state a claim under the Pennsylvania Securities Act if he purchased securities from First Options or sold securities to the defendant. 70 P.S. § 1–501. *See Biggans v. Bache Halsey Stuart Shields, Inc.,* 638 F.2d 605, 610 (3d Cir. 1980); *In re Catanella and E.F. Hutton & Co. Securities Litigation,* 583 F.Supp. 1388, 1439–40 (E.D.Pa.1984). Mr. Ferreri's complaint avers that First Options "purchased or sold securities in connection with its fraudulent conduct." Complaint, at ¶ 94.