**FAIRCHILD & COMPANY, INC., Plaintiff,**

**v.**

**RICHMOND, FREDERICKSBURG AND POTOMAC RAILROAD COMPANY, Defendant.**

**Civ. A. No. 80–450.**

United States District Court, District of Columbia.

June 30, 1981.

Thaddeus Holt, Washington, D. C., for plaintiff.

Stephen A. Trimble, Daniel McEvily, Washington, D. C., for defendant.

## MEMORANDUM

SIRICA, District Judge.

This matter is before the Court on the motion of the defendant, the Richmond, Fredericksburg and Potomac Railroad Com-

pany (Richmond) for summary judgment. The underlying cause of action has been brought by the plaintiff, Fairchild and Company, Inc. (Fairchild), to vacate an arbitration award rendered in connection with a dispute between the parties over a leasing agreement. Richmond, having counterclaimed to secure confirmation of the award and judgment thereon, now moves for summary judgment.

Jurisdiction has been premised on the diversity of citizenship in that Richmond, an interstate rail carrier, has its principal place of business in Virginia, and Fairchild is a District of Columbia corporation.

Richmond is the owner of a 38.5 acre tract of land in Alexandria, Virginia, situated between its Potomac freight yard and the George Washington Memorial Parkway, which runs along the tract's eastern border. In 1971, Fairchild, intending extensive commercial development of this property, entered into an agreement with Richmond whereby Fairchild obtained a 99-year lease of the tract. The controversy in this case has its origins in that lengthy document, which represents a comprehensive agreement between the parties setting forth their mutual rights, obligations and commitments under a plan providing for the development of the tract into a commercial complex to be known as the Potomac Center. The nature of the Potomac Center commercial complex as contemplated by Fairchild and Richmond is set forth in the leasing agreement which they executed. It addresses the construction of a development consisting of office buildings, apartment houses, stores, hotels and motels, parking garages, and other improvements of a quality and workmanship comparable to the nearby Crystal City complex.

Of course, to facilitate the development and commercial success of such a complex, it was necessary to assure adequate public access to the property. This originally presented a problem, because the Potomac Center was considered "landlocked" insofar as commercial development was concerned. That is to say, the only road which could meet the needs and goals of the contemplated development was the George Washington Memorial Parkway, a limited access national highway lacking ingress or egress to the property.

In order to alleviate this shortcoming, Charles Fairchild, the president and principal owner of Fairchild, had previously executed an "Exchange Agreement" with the United States government to permit the construction of suitable access facilities between the Parkway and the Potomac Center. In return for the granting of these access rights, Mr. Fairchild agreed, in part, to deliver to the United States another tract of land south of Alexandria, Virginia consisting of some 28.8 acres.

This exchange was referred to in the leasing agreement, which also provided for the construction of the necessary access facilities between the Parkway and the Potomac Center. Pursuant to the leasing agreement, Fairchild was to undertake and complete all of the necessary access construction by December 31, 1977, in addition to conveying the other 28.8 acres of property to the government. In return, Richmond agreed to pay Fairchild one million dollars as its contribution to the effort. Richmond's payment schedule to Fairchild provided for an initial $500,000 advance which was to be given after the lease and the property exchange agreement were executed and the deed for the 28.8 acre tract of land was recorded and accepted by the government. Fairchild, in return, agreed to pledge a performance bond or other security in the same $500,000 amount to assure completion of the access facilities prior to December 31, 1977. Additionally, Richmond placed $200,000 in an escrow account to be paid to Fairchild should it meet the deadline and to be returned to Richmond if it should not. Finally, the remaining $300,000 was to be paid to Fairchild in future years from the excess of the "net cash flow," a property income figure to be calculated according to a formula set forth in another section of the lease.

The property exchange agreement was executed and the deed to the second piece of property was delivered and accepted by

the government. Richmond paid the initial $500,000 to Fairchild and placed the additional $200,000 in escrow. Fairchild thereupon deposited notes as a pledge that the required overpass and related access facilities would be completed by December 31, 1977. However, the access facilities were not completed by that time, a situation which Fairchild attributes to the delay of the government in living up to its promise to grant the access rights. Richmond requested and received back the $200,000 it had placed in escrow.

In the interim, there was another development with regard to the provisions of the lease. The Washington Metropolitan Area Transit Authority sought to obtain a portion of the Potomac Center for purposes of constructing a subway line between National Airport and Alexandria. A condemnation trial was had in the United States District Court for the Eastern District of Virginia and the jury awarded $922,250 as compensation for the permanent taking and an additional $80,000 as compensation for the temporary easement used during the subway line construction. Despite the fact that the leasing agreement contained a lengthy provision relating to eminent domain awards, a dispute subsequently arose between the parties over these proceeds and the proper distribution of them.

Thereafter, Fairchild sent two letters, both dated May 11, 1979, to Richmond. The first of these indicated Fairchild's intent to submit the matter involving the $500,000 construction bond to arbitration pursuant to Article XXIV of the leasing agreement. That article provides:

Any controversy, claim or dispute arising out of or relating to this Agreement or to the interpretation, breach or enforcement thereof shall be submitted to arbitration in accordance with the rules then obtaining of the American Arbitration Association. Any award made as a result of arbitration shall be final, binding and conclusive on all parties hereto for all purposes, and judgment may be entered thereon in any court having jurisdiction.

The second letter consisted of a settlement offer with regard to the condemnation award, with a proviso that, in the event the offer was not accepted, the letter was to constitute a demand for arbitration pursuant to Article XXIV of the leasing agreement.

On June 15, 1979, Richmond itself filed a *formal* demand for arbitration pursuant to the arbitration provision of the leasing agreement, seeking disposition of the proceeds of the condemnation award in accordance with the various terms of the lease. This was followed shortly thereafter on June 18, 1979, with a second formal demand for arbitration pursuant to the lease, seeking repayment of the $500,000 which had been provided to Fairchild upon condition that it complete the access facilities to the Potomac Center by December 31, 1977.

Fairchild, in turn, responded with its own formal demand for arbitration pursuant to the lease on June 26, 1979, seeking a determination as to whether Richmond improperly declared a default and would have to return to escrow the $200,000 it had withdrawn, plus interest.

The arbitration proceeding took place between December 11 and 14, 1979, consuming three days, with a break of a day between the second and third. Both parties participated in the selection of the arbitrators and the proceedings were governed by the rules of the American Arbitration Association. No transcript of the proceedings was made and the panel issued no findings of fact or conclusions of law. With respect to the condemnation proceeds, Fairchild was awarded $129,006.47, and Richmond was awarded $10,000.00. The balance was divided between the two parties with Richmond to receive 92 percent and Fairchild to receive 8 percent, which amount was to be included in calculating the "net cash flow" figure of the leasing agreement. Richmond's claim for repayment of the $500,000 it had provided to Fairchild was granted along with interest at the rate of 11 percent. Fairchild's claim for the return to escrow of $200,000 plus interest was denied.

## I. THE APPLICABLE LAW

■ The jurisdiction of the Court in this action is premised upon diversity of citizenship, insofar as Richmond, an interstate rail carrier, has its principal place of business in Virginia, and Fairchild is a District of Columbia corporation. A diversity action such as this, brought to determine the validity of an arbitration award, will be decided upon the law of the applicable state, unless it falls within the provisions of the United States Arbitration Act, 9 U.S.C. §§ 1–14 (1976). *See Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956).

In that regard, Section 2 of the Act, 9 U.S.C. § 2, provides that a written provision for arbitration in "a contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." [1] Commerce, as used in this instance, is defined by Section 1 of the Act, 9 U.S.C. § 1, to include "commerce among the several States ... or between the District of Columbia and any State or Territory." [2]

■ The phrase, "involving commerce", as used in Section 2, which is determinative of the Act's application, is not to be construed narrowly. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401–02 n.7, 87 S.Ct. 1801, 1804–1805 n.7, 18 L.Ed.2d 1270 (1967). Congress has indicated in the legislative history of the Act that "commerce reaches not only the actual physical interstate shipment of goods, but also contracts relating to interstate commerce." H.R.Rep. No. 96, 68th Cong., 1st Sess. 1 (1924). Similarly, the Supreme Court has suggested a broad interpretation by intimating that a contract evidences a transaction involving commerce within the meaning of Section 2 of the Act where contractual activity facilitates interstate commercial transactions, *Prima Paint Corp. v. Flood & Conklin Mfg. Co., supra*, 388 U.S. at 401–02 n.7, 87 S.Ct. at 1804–1805 n.7, or where it affects commerce. *Bernhardt v. Polygraphic Co., supra*, 350 U.S. at 201, 76 S.Ct. at 275. A number of lower courts have also used this broad "affecting commerce" language to describe contracts evidencing transactions involving commerce. *See, e. g., Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402, 409 (2d Cir. 1959), *cert. dismissed*, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960); *Grand Bahama Petroleum Co. v. Asiatic Petroleum Corp.*, 550 F.2d 1320, 1324 (2d Cir. 1977); *Duplan Corp. v. W. B. Davis Hosiery Mills, Inc.*, 442 F.Supp. 86, 87 (S.D.N.Y.1977); *Legg, Mason & Co., Inc. v. Mackall & Coe, Inc.*, 351 F.Supp. 1367, 1371 (D.D.C.1972); *Sears Roebuck and Co. v. Glenwal Co.*, 325 F.Supp. 86, 90 (S.D.N.Y.1970), *aff'd*, 442 F.2d 1350 (2d Cir. 1971); *Dickstein v. DuPont*, 320 F.Supp. 150, 152 (D.Mass.1970), *aff'd*, 443 F.2d 783 (1st Cir. 1971).

■ Viewed in light of these interpretations, the Court believes that the conduct contemplated by the agreement in the

---

1. The full text of Section 2 provides:

 A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

2. The full text of Section 1 provides:

 "Maritime transactions", as herein defined, means charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign commerce which, if the subject of controversy, would be embraced within admiralty jurisdiction; "commerce", as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.

present instance was such as to fall within the scope of the Act. More specifically, there are several aspects of this leasing agreement indicating a contract evidencing transactions "involving commerce" within the meaning of Section 2 of the Arbitration Act.[3]

The first of these relates to the purpose of the agreement. This particular agreement was designed to initiate and facilitate the development of an extensive commercial venture similar in scope and quality to the nearby Crystal City complex. While the forty acre tract in question was located in Virginia, it is apparent that the commercial development contemplated by the agreement would serve the Washington metropolitan area, which includes, in addition to suburban Virginia, the District of Columbia and suburban Maryland. Thus, the goods and services to be provided by the anticipated commercial enterprises would be marketed by drawing upon the extensive consumer populations associated with nearby Washington and suburban Maryland, as well as Virginia.

This orientation of the planned development toward the commercial markets of Washington and suburban Maryland, in addition to Virginia, is evidenced to a great degree by the intended size of the project and its location in such close proximity to these densely populated jurisdictions. Moreover, the particular types of enterprises envisioned by the agreement, hotels, motels, stores and apartments, are commercial endeavors of such a nature as would encourage and take advantage of the flow of commerce between these jurisdictions.

Significant in this regard is the provision in the leasing agreement for facilitating access of the development to the George Washington Memorial Parkway, the limited access national highway which runs adjacent to the property. As the Parkway is a major transportation artery in a large metropolitan area encompassing more than one jurisdiction, a great flow of interstate commerce necessarily moves between the jurisdictions over it. The parties to the agreement were well aware of this fact, and, considering the property to be otherwise "landlocked," sought to take advantage of this potential by extending the highway's reach directly into the development. The commercial potential of the property would then have been "unlocked" and the flow of interstate commerce could have been tapped.

In order to secure the necessary access to the highway, Fairchild was willing to undertake two major financial obligations in accordance with the leasing agreement. First, it agreed to enter into a separate agreement for the delivery to the government of the 28.8 acre tract of land south of Alexandria, whose value had been estimated to be as high as eight million dollars. Second, it obligated itself to complete construction of the multi-million dollar access facilities necessary to connect the Potomac Center with the highway. Fairchild's willingness to take on such financial burdens to secure access to the highway dramatically underscores the importance of the interstate commercial purposes of the leasing agreement and thus the fact that it "involved commerce" within the meaning of the Act.

A second aspect of the agreement indicative of its "involving commerce" under the Act relates to the enormous amount of construction that it contemplated. A construction contract for a large project may be found to involve commerce and fall within the scope of the Act even if the project contemplated by the contract is located entirely within one state, since the presence of other interstate elements in the performance of the contract may satisfy the jurisdictional prerequisite. *Monte v. Southern Delaware County Authority*, 321 F.2d 870 (3d Cir. 1963); *Sears Roebuck and Co. v. Glenwal Co., supra.* For example, in *Sears*, the presence of interstate elements was found to be sufficient to satisfy the juris-

---

3. A leasing agreement may constitute a contract evidencing a transaction involving commerce within the meaning of the Act. *See, e.*

*g., American Airlines, Inc. v. Louisville & Jefferson County Air Board*, 269 F.2d 811 (6th Cir. 1959).

dictional prerequisite where the contract in question involved the construction of a three million dollar shopping center in New York, and material, equipment and workers for the project came into the job site from New Jersey. 325 F.Supp. at 89–90. *See also Metro Industrial Painting Corp. v. Terminal Construction Co.*, 287 F.2d 382 (2d Cir.), *cert. denied* 368 U.S. 817, 82 S.Ct. 31, 7 L.Ed.2d 24 (1961).

In the present instance, two major construction projects were envisioned by the leasing agreement. The first was the multi-million dollar construction of the access facilities to the highway. The second was the huge commercial complex itself. The massive scope of this intended construction and the proximity of the site to the other jurisdictions, make it reasonable to conclude that a substantial portion of the work force, materials and equipment were to come from outside of Virginia. A contract contemplating such substantial construction with accompanying interstate elements would be one "evidencing a transaction involving commerce" within the meaning of Section 2 of the Act. *See Sears Roebuck and Co. v. Glenwal Co., supra.*

A third aspect of the leasing agreement indicative of its "involving commerce" within the meaning of the Act was the fact that it was executed subject to proposals by public authorities for the construction of an interstate mass transportation rail system serving metropolitan Washington. The eminent domain provision of the lease specifically contemplated condemnation of the property for purposes of such construction, and, in fact, the condemnation of the property for the purposes of construction of that interstate rail system precipitated the arbitration in question.

Finally, it should be noted that the lease contained provisions relating to Richmond's interstate rail operations and requiring Fairchild to maintain the easements necessary for the operation of Richmond's rail yard facilities. Such provisions would also appear to "involve commerce" within the scope of the Act.

## II. ENFORCEMENT OF THE AWARD

[4, 5] Fairchild has taken exception to the award on a number of grounds and asks that it be vacated. Nevertheless, it must be remembered that the Arbitration Act has established the desirability of arbitration as an alternative to the complication of litigation, *see Wilko v. Swan*, 346 U.S. 427, 431, 74 S.Ct. 182, 184, 98 L.Ed. 168 (1953), and to effectuate this objective, judicial review of arbitration awards has been narrowly limited. *Revere Copper & Brass, Inc. v. Overseas Investment Corp.*, 628 F.2d 81 (D.C. Cir.1980), *cert. denied*, 446 U.S. 983, 100 S. Ct. 2964, 64 L.Ed.2d 839 (1980). Those circumstances under which a court may vacate an award are set forth in Section 10 of the Act, 9 U.S.C. § 10,[4] and any objection to the award must fall within the scope of that section if it is to serve as grounds for vacating the award. A summary and analysis of Fairchild's objections to the award follows.

### A. *Evident Partiality*

An arbitration award may be vacated in a situation where it is demonstrated that there was evident partiality in the arbitrators. 9 U.S.C. § 10(b). Fairchild has alleged such evident partiality on the part of the chairman of the panel and seeks to have the award vacated on that ground. Richmond has disputed this claim and has submitted affidavits averring: (1) that Richmond had no relationship with any of the arbitrators; (2) that the arbitrators were required to take an oath that they had no

4. These consist of situations:
 (a) Where the award was procured by corruption, fraud, or undue means.
 (b) Where there was evident partiality or corruption in the arbitrators, or either of them.
 (c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
 (d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

undisclosed relationships or conflicts of interest and that they would proceed properly; and (3) that the arbitrators, in fact, did not show any partiality in favor of Richmond at the hearing.

Fairchild, in response, has indicated that its claim of evident partiality was not intended to suggest that there was any disqualifying bias due to some special relationship to a party or interest in the outcome of the proceedings on the part of an arbitrator. *See, e. g., Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968). Instead, Fairchild has relied upon a conclusory allegation that one of the arbitrators displayed "personal hostility" toward Fairchild's counsel, manifested by rudeness and interruptions during the proceedings.

Absent some sort of overt misconduct, a disappointed party's perception of rudeness on the part of an arbitrator is not the sort of "evident partiality" contemplated by the Act as grounds for vacating an award. During the course of a hearing, it is to be expected that an arbitrator may develop an opinion and perhaps even express it. *Ballantine Books, Inc. v. Capital Distributing Co.*, 302 F.2d 17, 21 (2d Cir. 1962). In addition, since the advantages of arbitration are speed and informality, an arbitrator should be expected to act affirmatively to simplify and expedite the proceedings before him. *Id.* Accordingly, it is not surprising that within the informal confines of an arbitration proceedings, an unsuccessful party eventually may perceive the demeanor of an arbitrator as less than satisfactory. Similarly, an arbitrator's legitimate efforts to move the proceedings along expeditiously may be viewed as abrasive or disruptive to a disappointed party. Nevertheless, such displeasure does not constitute grounds for vacating an arbitration award.

Fairchild also alleges partiality on the part of the arbitrators in favor of Richmond as evidenced by the agreement of the award with the proposed results offered by Richmond. However, evident partiality is not demonstrated where an arbitrator consistently relies upon the evidence and reaches the conclusions favorable to one party. *See Bell Aerospace Co. v. Local 516, UAW*, 500 F.2d 921, 923 (2d Cir. 1974). The mere fact that arbitrators are persuaded by one party's arguments and choose to agree with them is not of itself sufficient to raise a question as to the evident partiality of the arbitrators.

**B. Refusal to postpone**

Section 10(c) of the Act permits an award to be vacated in an instance where arbitrators are guilty of misconduct in refusing to postpone a hearing upon sufficient cause shown. Fairchild asserts that the arbitrators were guilty of such misconduct in the present instance in their refusal to postpone the proceedings for three months to permit Fairchild to be adequately represented by counsel. More specifically, Fairchild maintains that due to an unfortunate series of circumstances, a number of lawyers whom it retained were compelled to withdraw, with the result that it was unable to secure adequate legal representation for the purposes of the arbitration proceedings until shortly before they were commenced. Thus, it argues that a postponement had been necessary to permit it to adequately prepare for the hearing, and that the refusal to grant the same amounted to misconduct by the arbitrators.

The arbitrary denial of a reasonable request for a postponement may serve as grounds for vacating an arbitration award. *See Tube & Steel Corp. of America v. Chicago Carbon Steel Products*, 319 F.Supp. 1302 (S.D.N.Y.1970). However, the expeditious resolution of a dispute remains one of the principal purposes for referring the matter to arbitration, and the statute limits the Court's review to a determination as to whether the arbitrators were guilty of *misconduct* in refusing a postponement. As such, it follows that arbitrators are to be accorded a degree of discretion in exercising their judgment with respect to a requested postponement. Therefore, assuming there exists a reasonable basis for the arbitrators' considered decision not to grant

a postponement, the Court will be reluctant to interfere with the award on these grounds.

In the present instance, the arbitrators had the benefit of arguments for and against the requested postponement, and the Court's own review persuades it that there was a sufficient basis for the arbitrators to conclude: (1) that Fairchild had had ample time to secure adequate legal representation and prepare for the arbitration proceedings; and (2) that Fairchild's arguments in support of its request did not justify a substantial delay in the resolution of the case. This is particularly so in view of the fact that Fairchild, a corporation with substantial resources, had itself made a formal demand for arbitration, yet purportedly remained unprepared for a hearing nearly six months after that demand.

C. *Refusal to hear evidence*

 Fairchild further challenges the validity of the award pursuant to Section 10(c) of the Act by alleging that the arbitrators were guilty of misconduct in several respects for refusing to hear evidence pertinent and material to the controversy. In analyzing the allegations it should be remembered that arbitrators are charged with the duty of determining what evidence is relevant and what is irrelevant. *Petroleum Transport, Ltd. v. Yacimientos Petroliferos Fiscales,* 419 F.Supp. 1233, 1235 (S.D. N.Y.1976), *aff'd,* 556 F.2d 558 (2d Cir. 1977). While they may err in their determination, every failure to receive relevant evidence does not constitute misconduct under the Act so as to require the vacation of the award. The error which would constitute misconduct so as to justify vacating an award must not simply be an error of law, but one which so affects the rights of a party that it may be said to deprive him of a fair hearing. *See Newark Stereotypers Union No. 18 v. Newark Morning Ledger Co.,* 397 F.2d 594, 599 (3d Cir.), *cert. denied,* 393 U.S. 954, 89 S.Ct. 378, 21 L.Ed.2d 365 (1968).

Fairchild's first allegation of misconduct in this regard rests on its contention that the arbitrators denied it the right to cross-examination. In so contending Fairchild argues as a general principle that it is not fair to allow one party's evidence to go untested by dispensing with cross-examination altogether. Nevertheless, Fairchild's own affidavits indicate that after the only witness for Richmond had testified on the morning of the first day of the proceedings, he was cross-examined by Fairchild's attorney for the rest of that day and into the next. Therefore, it is apparent that his testimony did not go untested as Fairchild claims, nor did the arbitrators dispense with cross-examination altogether. A closer examination of its arguments reveals that Fairchild has actually taken exception to the rulings by which the arbitrators sustained objections raised by Richmond. Those objections limited cross-examination to the scope of matters testified to by the witness for Richmond on direct and restricted inquiry into his legal opinions.

 In taking exception to these specific evidentiary rulings, Fairchild merely suggests the possibility that the arbitrators committed simple errors of law rather than misconduct which would have undermined the fairness of the proceedings. Arbitrators must be expected to take actions which will expedite the proceedings, *Ballantine Books, Inc. v. Capital Distributing Co., supra,* and where, as here, the cross-examination is extensive and the cross-examining party will have a later opportunity to call its own witnesses, it is not inherently unfair to limit the scope of that cross-examination to matters which were dealt with on direct. Additionally, it is to be noted that arbitrators are given discretion in determining whether additional evidence is necessary or would simply prolong the proceedings. *Catz American Co. v. Pearl Grange Fruit Exchange, Inc.,* 292 F.Supp. 549, 553 (S.D.N. Y.1968). Therefore, inquiry into the legal opinions of a witness, particularly where, as here, that witness was a layman, quite reasonably could be viewed as unnecessary and a matter best left to the arguments of counsel.

Fairchild's second allegation of misconduct with respect to the refusal to hear material evidence consists of a purported complaint that Charles Fairchild was not permitted to testify in rebuttal. However, Fairchild's own affidavits reveal that Charles Fairchild *was* permitted to testify in response to the testimony of Richmond's witness. In actuality, the substance of its complaint deals with the manner in which his testimony was elicited. Specifically, Fairchild's counsel sought to elicit the testimony by comparing it with that of Richmond's witness on a point by point basis, while the arbitrators preferred to simply let Charles Fairchild "tell his story."

Once again, the Court is not persuaded that an attempt such as this to simplify and possibly hasten the presentation of a witness' testimony amounts to misconduct striking at the fundamental fairness of the hearing. Instead, it represents a discretionary decision by the arbitrators as to how they wished to receive Fairchild's testimony, which, in the ultimate analysis, was received and considered. In the informal context of an arbitration proceeding where the common law rules of evidence are not binding, see *Barker v. Government Employees Insurance Co.,* 339 F.Supp. 1064, 1067 (D.D.C.1972), arbitrators should be permitted, as courts often do, to clarify and simplify the presentation of testimony by letting a witness "tell his story." If there was error in receiving testimony in this manner, it was simple error of law which did not amount to misconduct depriving Fairchild of a fair hearing.

Finally, Fairchild alleges misconduct on the part of the arbitrators as a result of their refusal to receive in evidence the transcript of the condemnation trial and the drafts of the leasing agreement. The trial transcript was offered as evidence of the valuation of the condemned interests, the damage to Fairchild resulting from the condemnation, and the expenses incurred by Richmond during the trial. The drafts of the lease were offered to explain the meaning of its provisions.

As regards these objections, the Court would merely reiterate that the determination as to the relevance or irrelevance of this particular documentary evidence would be a matter entrusted to the arbitrators. Irrespective of whether they correctly ruled on receiving this evidence, the Court believes that any mistake with respect to these rulings would also not amount to *misconduct* such as would undermine the fundamental fairness of the proceedings. As such it would not provide the grounds for vacating the award.

### D. *Manifest Disregard for the Law*

Fairchild has contended that the arbitrators acted in manifest disregard of the law in reaching their decision. The Supreme Court has suggested that an award may be set aside if made by the arbitrators in manifest disregard of the law. *See Wilko v. Swan, supra,* 346 U.S. at 436, 74 S.Ct. at 187. *See also, Revere Copper & Brass, Inc. v. Overseas Investment Corp., supra,* 628 F.2d at 84. Of course, manifest disregard for the law must go beyond a mere error in the law or failure on the part of the arbitrators to understand or apply the law before it will serve as grounds for vacating an award. *See San Martine Compania De Navegacion, S.A. v. Saguenay Terminals, Ltd.,* 293 F.2d 796, 801 (9th Cir. 1961). For example, such manifest disregard may exist where the arbitrators understand and correctly state the law, but proceed to disregard it nonetheless. *Id.* In this instance, however, Fairchild's allegations fall within the realm of errors in the understanding or the application of the law, rather than rising to the level of manifest disregard. Nowhere is it alleged that the arbitrators undertook to correctly state the law and then proceeded to disregard their own pronouncement.

Similarly, the Court is not persuaded by Fairchild's other allegation that the decision of the arbitrators lacked a rational basis. Aside from the fact that the Court does not read the award as being incompatible with the provisions of the leasing agreement, Fairchild's arguments once

again amount to no more than an assertion that the arbitrators incorrectly applied the provisions of the leasing agreement. Such an allegation is not sufficient to invalidate an award, particularly in a situation such as this, where the arbitrators were not required to provide an explanation of their ruling and there is no record of the proceedings. *Accord Wilko v. Swan, supra,* 346 U.S. at 436, 74 S.Ct. at 187.

### E. *Other Claims*

 At this point it should also be noted that Fairchild maintains that the award must be vacated because the arbitrators failed to provide a statement of reasons for their decision. However, the arbitrators may render a decision without an explanation of their reasons, *see Wilko v. Swan, supra; see also C. M. Hale v. Friedman,* 281 F.2d 635 (D.C. Cir. 1960), and there is no indication that they were required to do otherwise in this instance.

Fairchild further asserts that the arbitrators exceeded their powers in that they determined the rights of individuals who were not parties to the arbitration. Specifically, it claims that an equitable claim against Richmond by Charles Fairchild and his wife was not considered by the arbitrators in reaching their decision on the distribution of the condemnation award.

 The Court finds no merit to this challenge. Charles Fairchild and his wife, through their attorney, consented to the payment of the award jointly to Richmond and Fairchild. The arbitrators thereupon decided the respective rights to the award between Richmond and Fairchild. Moreover, Charles Fairchild and his wife were not parties to the lease as individuals, and therefore need not have been included in the arbitration proceedings. The arbitrators cannot be said to have exceeded their powers by failing to act upon an equitable

claim of individuals not parties to the controversy before them.

 A final argument advanced by Fairchild is that the award is invalid inasmuch as the arbitrators did not deliberate and act as a body. In support of the allegation, it notes that one of the arbitrators signed the award the day after the other two arbitrators signed it. The Court is not persuaded that this mere fact raises any material issue as to whether the arbitrators properly deliberated so as to call into question whether a mutual, definite and final award was made.

### III. CONCLUSION

The leasing agreement at issue here was a contract evidencing a transaction "involving commerce" within the meaning of Section 2 of the Arbitration Act. As such the Court's review of the award is governed by the Act and the provisions it makes for setting an award aside. Fairchild has failed to raise any genuine issue of material fact as to whether the award violated the provisions of Section 10 of the Act, and Richmond is entitled to judgment as a matter of law. Accordingly, summary judgment shall be entered in favor of Richmond and the arbitration award shall be confirmed.[5] An appropriate order accompanies this Memorandum.

---

**5.** Fairchild has moved to strike the "Further Affidavit of Urchie B. Ellis," filed on May 15, 1980, shortly before the hearing on the motion for summary judgment. Rule 56(e) of the Federal Rules of Civil Procedure states that "[t]he court *may permit affidavits to be supplemented* or opposed by ... further affidavits." The Court, in the exercise of its discretion, will permit the additional affidavit to be considered in this instance, although it does not believe it is essential to the result reached here today.