**B–S STEEL OF KANSAS, INC., Plaintiff,**

v.

**TEXAS INDUSTRIES, INC., et al., Defendants.**

Chaparral Steel Midlothian, L.P., Plaintiff,

v.

B–S Steel Of Kansas, Inc., Defendant

B–S Steel Of Kansas, Inc. Plaintiff,

v.

Chaparral Steel Midlothian, L.P., Defendant

Nos. 01–2410–JAR, 03–2664–JAR, 04–4053–JAR.

United States District Court, D. Kansas.

June 14, 2004.

David A. Rameden, Jerrod A. Westfahl, David A. Rameden, Shook, Hardy & Bacon L.L.P., Overland Park, KS, James R. Eiszner, Shook, Hardy & Bacon L.L.P., Kansas City, MO, for Plaintiff.

Dennis D. Palmer, George E. Leonard, Shughart Thomson & Kilroy, PC, Kansas City, MO, for Defendants.

### MEMORANDUM AND ORDER DENYING MOTION TO VACATE AND GRANTING MOTION TO CONFIRM ARBITRATION AWARD

ROBINSON, District Judge.

This matter comes before the Court on Chaparral Steel Midlothian, L.P.'s (Midlothian) Petition for Order Confirming Arbitration Award (Case No. 03–2664—Doc. 1) and B–S Steel of Kansas, Inc.'s (B–S Steel) Answer and Opposition to Confirm and Suggestions in Support of Vacating Arbitration Award (Case No. 01–2410—Doc. 291). B–S Steel also filed a Motion to Vacate the Arbitration Award in the Northern District of Texas, which has since been transferred to this Court (Case No. 04–4053—Doc. 1) and will be addressed in this Order. For the reasons

stated below, Midlothian's motion to confirm the arbitration award is granted and B–S Steel's motion to vacate the award is denied.

## I. Background

On August 15, 2001, B–S Steel filed suit in Case No. 01–2410, naming as defendants Texas Industries, Inc. and Chaparral Steel Company. B–S Steel filed an amended complaint on December 6, 2001, naming as additional defendants Chaparral Steel Texas, Inc. and Midlothian. B–S Steel's amended complaint alleged that the four defendants committed various violations of state and federal law by entering into a "secret deal" to sell steel at a lower price to B–S Steel's competitors. By its Order dated September 3, 2002,[1] (September 2002 Order) this Court referred B–S Steel's claims against Midlothian, which were based on transactions occurring before April 3, 2001, to arbitration pursuant to the Conditions of Sale Contract between B–S Steel and Midlothian. This Court found in its Order that the Conditions of Sale Contract signed in February 1997 and effective after July 1, 1996 was "valid and enforceable."

B–S Steel voluntarily dismissed Midlothian from Case No. 01–2410 on September 17, 2002. On that same day, B–S Steel informed Midlothian by letter that it was unwilling to proceed to arbitration. Subsequently, Midlothian filed a Demand for Arbitration with the American Arbitration Association seeking an order declaring that Midlothian was not liable to B–S Steel on its claims against Midlothian. On November 6, 2002, B–S Steel filed counterclaims against Midlothian in the arbitration, which were based on the same transactions and representations that the original claims in B–S Steel's Amended Complaint were based upon. A three member panel of arbitrators was appointed, and after a nine day hearing and the designation of many exhibits, the arbitrators issued a reasoned award.

Initially, Midlothian sought to confirm the arbitration award by filing a Motion for Order Confirming Arbitration Award in Case No. 01–2410, but then Midlothian voluntarily dismissed the motion and filed a new action. In the new action, Case No. 03–2664, Midlothian sought only a Petition for Order Confirming Arbitration Award, which was nearly a verbatim recitation of its previously filed Motion to Confirm in Case No. 01–2410. Subsequently, Case Nos. 01–2410 and 03–2664 were consolidated.

On December 31, 2003, the same day Midlothian filed its original motion to confirm the arbitration award, B–S Steel filed in the Northern District of Texas a motion to vacate the arbitration award. Subsequently, Midlothian petitioned the Texas court for a motion to transfer B–S Steel's motion to vacate the award to the District of Kansas, pursuant to 28 U.S.C. § 1404. On May 10, 2004, Judge Sam Lindsay ordered the Texas case transferred to the District of Kansas. Midlothian's motion to confirm and B–S Steel's motion to vacate the arbitration award are now before the Court.

## II. Discussion

B–S Steel argues that the Court should vacate the arbitration award because 1) the reasoned award is void ab initio due to this Court's and the arbitrators' lack of jurisdiction; 2) the underlying claims were not arbitrable in the first place; and 3) the arbitration was fundamentally flawed and unfair.

### A. This Court Lacks Jurisdiction

B–S Steel suggests that the arbitration award is void ab initio because this Court

---

**1.** *B–S Steel of Kansas, Inc. v. Texas Indus.,* *Inc.,* 229 F.Supp.2d 1209 (D.Kan.2002).

lacked jurisdiction to stay proceedings and refer the case to arbitration in the first place based upon a forum selection clause which B–S claims makes the Northern District of Texas the only proper forum for its claims. Additionally, B–S Steel argues that the arbitration award is void because this Court did not have jurisdiction to "compel" arbitration pursuant to 9 U.S.C. § 4. Since the arbitrators based their jurisdiction on the Court's Order staying the proceedings to refer the case to arbitration, B–S Steel avers that the arbitrators did not have jurisdiction either.

■ The Court has already considered B–S Steel's suggestion that the Court lacked jurisdiction and noted that the forum selection clause raises concerns not of subject matter jurisdiction but of venue.[2] Further, the Court rejected B–S Steel's argument, noting that B–S Steel originally chose this forum when it filed suit in Case No. 01–2410, that B–S Steel had originally argued that venue was proper in the District of Kansas, and that B–S Steel long ago waived venue.[3] The Court's prior ruling that it has jurisdiction is law of the case;[4] consequently, the Court rejects B–S Steel's misguided suggestion that jurisdiction is lacking due to the forum selection clause.

Likewise, B–S Steel's contention that this Court compelled arbitration pursuant to § 4 of the Federal Arbitration Act[5] (FAA) in its September 2002 Order is mistaken. The only mention of compelling arbitration is in the caption to the Court's Order, "Memorandum & Order … Granting in Part Chaparral Steel Midlothian's Motion to Stay and Compel Arbitration." The text of the Order, however, states that "the Court grants Chaparral Midlothian's motion to stay and refer to arbitration claims with respect to transactions occurring before April 3, 2001."[6] Moreover, the Order discusses only § 3 of the FAA,[7] which provides that a court can stay proceedings upon being satisfied that claims are referable to arbitration under an agreement. The Court clearly had the power to stay the action pursuant to § 3, and the power to stay is not conditioned on the power to compel arbitration under § 4 of the FAA.[8]

The Court never addressed § 4, which allows a district court to compel arbitration when a party has been aggrieved by the refusal of another to arbitrate under a written agreement, because Midlothian did not ask the Court to compel arbitration as contemplated by § 4. Indeed, B–S Steel has stated that it was not even aware of an

---

**2.** *B–S Steel of Kansas, Inc. v. Texas Indus., Inc.*, Civ. Nos. 01–2410 & 03–2664, 2004 WL 946894 at *2 (D.Kan. April 29, 2004) ("B–S Steel's contention that this Court's subject matter jurisdiction is somehow implicated by the forum selection clause … defies reason.").

**3.** *Id.* at *3–4.

**4.** *United States v. Monsisvais*, 946 F.2d 114, 115 (10th Cir.1991) ("The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."); *Wilson v. Meeks*, 98 F.3d 1247, 1250 (10th Cir.1996).

**5.** 9 U.S.C. § 4.

**6.** *B–S Steel of Kansas, Inc.*, 229 F.Supp.2d at 1213. This statement appears under the heading "Relief to be Given to Defendants." Further, the Court ordered that Midlothian's "Motion to Stay Proceedings and to Refer Case to Arbitration" be granted. *Id.* at 1229.

**7.** 9 U.S.C. § 3.

**8.** *See Shanferoke Coal & Supply Corp. v. Westchester Serv. Corp.*, 293 U.S. 449, 453, 55 S.Ct. 313, 79 L.Ed. 583 (1935) ("We think the Court of Appeals was clearly right in concluding that there is no reason to imply that the power to grant a stay is conditioned upon the existence of power to compel arbitration in accordance with section 4 of the [FAA].").

arbitration agreement until the motion to stay and refer the matter to arbitration was filed. Thus, at the time Midlothian filed its motion for a stay, it had not yet asked B–S Steel to arbitrate the claims, and therefore could not have been aggrieved by B–S Steel's refusal to arbitrate. In sum, not only was the Court's Order devoid of a directive compelling arbitration pursuant to § 4, it would have been improper for the Court to have done so because B–S Steel had not yet refused to arbitrate the claims.[9]

## B. The Underlying Claims were not Arbitrable

B–S Steel argues that the underlying claims were not arbitrable because the 1997 Agreement, containing the arbitration clause, does not apply to the dispute, the claims are not arbitrable under the 1997 Agreement, and, alternatively, that the 2001 Agreement, which contains no arbitration clause, superceded the 1997 Agreement. Finally, B–S Steel suggests that *Clary v. The Stanley Works* [10] demonstrates that there was no agreement to arbitrate in the first instance.

B–S Steel first argues that the 1988 Conditions of Sale, which does not contain an arbitration clause, applies to the dispute, rather than the 1997 Agreement. The Court notes that the validity and scope of the 1997 Agreement were before the Court in its September 2002 Order and the Court found the 1997 Agreement to be valid and enforceable and to apply to shipments after its effective date and until the effective date of the 2001 Agreement. This determination is law of the case, and B–S Steel's argument must fail.

Even if the Court were to entertain B–S Steel's argument that the 1988 Conditions of Sale applies to the disputed claims because the "1997 Agreement never complied with Paragraph 19 of the 1988 Conditions of Sale: to wit, the 1997 Agreement was not "executed by both parties," as required by the 1988 Conditions of Sale," B–S Steel would still fall short. The 1997 Agreement was not a modification of the 1988 Conditions of Sale such that it was required to be "executed by both parties." Rather, the 1997 Agreement was a new contract. Paragraph 22 of the 1997 Agreement provides:

> This agreement constitutes the entire understanding of the parties with respect to the subject matter hereof, *supplant and supercedes any prior agreements* or understandings and may only be amended or modified by an agreement in writing executed by both parties. (emphasis added).

Thus, by its own terms, the integration clause in the 1997 Agreement supplanted and superceded the 1988 Conditions of Sale.[11]

The Court has also previously held that B–S Steel's antitrust claims are arbitrable under the 1997 Agreement. In the Court's September 2002 Order, it stated that the

---

**9.** *See* 9 U.S.C. § 4 (requiring a party seeking to compel arbitration to be aggrieved); *Hartford Acc. & Indem. Co. v. Equitas Reinsurance Ltd.,* 200 F.Supp.2d 102, 108 (D.Conn.2002) ("Absent a refusal by the other party to arbitrate, arbitration cannot be compelled under section 4" because the party seeking to compel arbitration would not have been aggrieved).

**10.** Case No. 03–1168, 2003 WL 21728865 (D.Kan. July 24, 2003).

**11.** *See Wayman v. Amoco Oil Co.,* 923 F.Supp. 1322, 1338 (D.Kan.1996) ("[T]he credit card contracts ... have an integration clause. It provides that all prior agreements and understandings pertaining to the subject matters covered in the credit card contracts are cancelled and superseded and that there are no other agreements, written or oral, between the parties pertaining to those matters. Hence, the credit card contracts ... are 'final expressions' and cannot be contradicted by evidence of any prior agreement.").

arbitration clause of the 1997 Agreement was "quite broad." [12] "It covers not only claims or controversies tied to the parties' conduct, but to any other transactions between the parties, And, it covers transactions that are related, even if they don't arise out of the contract. Such broad language covers [B–S Steel's] antitrust and tort claims ...." [13] B–S Steel's arguments therefore fail as this Court's prior holding is controlling.

B–S Steel's suggestion that the 2001 Agreement, which contained no arbitration clause, superceded the 1997 Agreement was also previously considered and rejected by this Court. The Court held that:

> [T]he 2001 Agreement, signed on April 3, 2001, is expressly limited to *future transactions.*" Thus its subject matter is entirely separate and distinct from the 1997 agreement, which is limited to transactions after its effective date, but before the effective date of the 2001 agreement. Because transactions predating April 3, 2001 are still subject to the terms of the 1997 contract, the arbitration clause applies. [14]

Because the Court finds no error in its September 2002 Order, it declines to modify its prior holding.

Finally, B–S Steel argues that *Clary v. The Stanley Works,* which was decided in July 2003, after this Court's September 2002 Order, demonstrates that there was no agreement to arbitrate in the first instance. The *Clary* court first noted that "as a general rule, arbitration agreements do not require a signature, so long as the

agreement is in writing." [15] But, the contract at issue in *Clary* expressly required the signature of both parties before becoming effective. [16] Only one party signed the contract and the court held that because the contract required both parties' signature, "no enforceable, written agreement to arbitrate ever came into existence." [17] In contrast to the contract in *Clary,* the 1997 Agreement does not require signatures of both parties to become effective. Thus, the general rule applies and Midlothian need not have signed the 1997 Agreement for the arbitration clause to be effective. [18]

Nor is B–S Steel's argument that the 1988 Agreement contained an express signature requirement, which mandated that the 1997 Agreement be signed by both parties, persuasive. B–S Steel points to paragraph 19 of the 1988 Agreement which states that it could "only be amended or modified by an agreement in writing executed by both parties." But, as previously discussed, the 1997 agreement is not an amendment of the 1988 agreement; rather, it is an entirely new agreement. Moreover, the Court has already determined that the 1997 Agreement is valid and enforceable.

### C. The Arbitration was Fundamentally Flawed and Unfair

B–S Steel argues that the arbitration award is fundamentally flawed because the arbitrators manifestly disregarded the applicable law, the award was procured by fraud, the arbitrators were partial to Midlothian, and the arbitrators created a fun-

---

**12.** *B–S Steel of Kansas, Inc.,* 229 F.Supp.2d at 1226.

**13.** *Id.*

**14.** *Id.* at 1225–26.

**15.** 2003 WL 21728865 at *3.

**16.** *Id.*

**17.** *Id.* at *4.

**18.** *See Med. Dev. Corp. v. Indus. Molding Corp.,* 479 F.2d 345, 348 (10th Cir.1973); *Clary,* 2003 WL 21728865 at *3 (distinguishing *Clary,* which contained an express signature requirement from *Medical Development,* which contained no such requirement).

damentally unfair arbitration process by excluding specific evidence.

The Court's power to review an arbitration panel award is quite limited; indeed, it is "among the narrowest known to the law."[19] A court may only vacate an arbitration award for reasons enumerated in § 10 of the FAA,[20] or for a handful of judicially created reasons.[21] Section 10 allows vacation of an arbitration award only where 1) the award was procured by corruption, fraud, or undue means; 2) there was evidence of partiality or corruption on the part of the arbitrators; 3) the arbitrators were guilty of misconduct; or 4) the arbitrators exceeded or imperfectly executed their powers.[22] A judicially created reason to set aside an arbitration award exists when an award violates public policy, is based upon a manifest disregard of the law, or the arbitrators did not conduct a fundamentally fair hearing.[23] If an arbitration award is not vacated, modified or corrected, the award must be confirmed.[24]

**1. The Arbitrators Acted with Manifest Disregard for the Law**

▮▮▮▮ B–S Steel suggests that the arbitration award must be vacated because "in making the award the arbitrators acted with manifest disregard for the law." A manifest disregard of the law means "willful inattentiveness to the governing law."[25] Mere error or misunderstanding of law is not enough for a finding of manifest disre-

gard; instead, the record must show that "the arbitrators knew the law and explicitly disregarded it."[26]

**The Arbitrators Ignored Antitrust Law**

▮▮▮ Specifically, B–S Steel avers that the arbitrators were presented with the applicable standards for proving antitrust injury in the Robinson–Patman Act context, but despite being presented with these standards, the arbitrators disregarded them. B–S Steel asserts that the arbitrators required it "to show, through direct evidence or admissions, that the Favored Buyers passed through some or all of the discount they received from Midlothian before antitrust injury could occur," rather than allowing B–S Steel to show antitrust injury through other methods.

B–S Steel blurs the standard for recovering antitrust damages by citing cases discussing the standards for proving antitrust injury pursuant to § 2(a) of the Robinson–Patman Act, but yet seeking treble damages under § 4 of the Clayton Act. It is well-settled that "to recover treble damages ... a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent ... [and] must prove more than a violation of § 2(a), since such proof only establishes that injury may result."[27] Moreover, B–S Steel was required not only to show actual injury, but that injury must have been causally linked to the violation.[28]

**19.** *Bowen v. Amoco Pipeline Co.,* 254 F.3d 925, 932 (10th Cir.2001).

**20.** 9 U.S.C. § 10.

**21.** *Denver & Rio Grande W. R.R. Co. v. Union Pac. R.R. Co.,* 119 F.3d 847, 849 (10th Cir. 1997).

**22.** *See* 9 U.S.C. § 10(a).

**23.** *Id.* (citations omitted).

**24.** 9 U.S.C. § 9; *P & P Indus., Inc. v. Sutter Corp.,* 179 F.3d 861, 870 (10th Cir.1999).

**25.** *Bowen v. Amoco Pipeline Co.,* 254 F.3d 925, 932 (10th Cir.2001).

**26.** *Id.*

**27.** *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981); *World of Sleep, Inc. v. La–Z–Boy Chair Co.,* 756 F.2d 1467, 1479 (10th Cir. 1985).

**28.** *Texaco Inc. v. Hasbrouck,* 496 U.S. 543, 572–73, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990); *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1531 (3d Cir.1990).

The arbitrators recognized this when they wrote: "Accordingly B–S Steel faces a much higher standard in order to prove injury for purposes of recovering damages under its Clayton Act claim; it must, of course, be able to show a causal connection between the price discrimination in violation of the Act and the injury suffered."

The arbitrators also correctly stated the quantum of proof in a § 4 claim. B–S Steel was required to show more than a violation of the antitrust laws; rather, it must have presented some direct evidence of injury to support an award of damages.[29] The direct evidence may be evidence of lost sales, evidence that substantial price discrimination reflected in the resale prices of the favored competitors directly resulted in B–S Steel losing certain sales and losing profits on others, or an expert report outlining the magnitude of the price difference.[30] Additionally, once the fact of damage has been shown, the burden of showing the precise amount of injury is eased somewhat because the vagaries of the marketplace make it difficult to ascertain business damages.[31]

After carefully synthesizing the law and considering B–S Steel's evidence, the arbitrators determined that the injuries asserted by B–S Steel, its lost sales and margin squeeze damages, "fell far short of the quality of evidence needed to demonstrate that any lost sales or margin squeeze was materially caused by Chaparral's conduct." The Court finds no error in the arbitrators' determination that B–S Steel failed to carry its burden of proving antitrust injury or damages, as required by *Payne* and its progeny, given the Court's limited power to review an arbitration award. B–S Steel's contention that the arbitrators required it to show that the favored buyers passed through the discounts they received misconstrues the arbitrators' award. The arbitrators simply noted that because BS–Steel was unable to establish that the favored buyers passed on the discounts, B–S Steel had failed to prove the requisite *causal connection* between the discounts and B–S Steel's damages. As discussed above, a causal connection is a necessary component of a § 4 Act claim.

B–S Steel's suggestion that the arbitrators acted with manifest disregard by failing to discuss the cases cited in its briefs or the testimony of Dr. White, is also misplaced. It is established that the arbitrators need not discuss every case cited by a party; in fact, arbitrators need not explain their reasons for an award.[32] And, B–S Steel has not indicated how the arbitrators' failure to discuss the testimony of Dr. White, Midlothian's expert, was in error. More importantly, even if the arbitrators erred, B–S Steel has presented no evidence that such error would amount to a "willful inattentiveness to the governing law." Thus, B–S Steel's suggestion that the arbitrators acted with a manifest disregard for the law must fail.

### The Arbitrators Failed to Apply Texas Law to the Fraud Claims

■ B–S Steel also argues that the arbitrators acted with manifest disregard for the parties choice of Texas law when resolving B–S Steel's fraud claims. Because this Court in its September 2002 Order found the 1997 Agreement valid and enforceable and that "the parties chose Tex-

**29.** *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.,* 63 F.3d 1267, 1274 (3d Cir.1995) (quoting *Feeser,* 909 F.2d at 1540).

**30.** *See Feeser,* 909 F.2d at 1540.

**31.** *J. Truett Payne Co.,* 451 U.S. at 566–67, 101 S.Ct. 1923, 68 L.Ed.2d 442.

**32.** *See Wilko v. Swan,* 346 U.S. 427, 436, 74 S.Ct. 182, 98 L.Ed. 168 (1953), *overruled on other grounds by Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989).

as as their choice of law in this 1997 Agreement," B–S Steel suggests that the arbitrators erred when they applied Kansas law to the fraud claims.

Because this case was arbitrated in Texas, the choice of law rules for Texas applied to determine the substantive law governing B–S Steel's claims for fraud.[33] Texas courts do not apply contract choice of law provisions to claims sounding in tort, but rather use the Restatement's "most significant relationship test." [34] The arbitrators determined that Kansas was the state with the most significant relationship to B–S Steel's fraud claims, and therefore applied Kansas law. Thus, the arbitrators correctly applied Texas choice of law rules. Even if the arbitrators erred in their application of Texas choice of law rules, mere error does not constitute "manifest disregard for the law."

### 2. Midlothian Procured the Arbitration Award through Fraud

██ B–S Steel urges that the arbitration award be vacated because the award was procured through fraud. Essentially, B–S Steel argues that Midlothian misrepresented that it was the true seller of steel, and once B–S Steel added Midlothian as a party, Midlothian took advantage of its fraud by filing a motion to stay proceedings and refer the matter to arbitration.

Under the FAA, a court may vacate an arbitration award where the "award was procured by corruption, fraud, or undue means." [35] However, "to protect the finality of arbitration decisions, courts must be slow to vacate an arbitration award on the ground of fraud." [36] "The party asserting fraud must establish it by clear and convincing evidence, and must show that due diligence could not have resulted in the discovery of the fraud prior to the arbitration." [37] Tellingly, B–S Steel does not discuss the due diligence standard. The Court concludes that, through due diligence, B–S Steel could have discovered the true seller of steel, between August 15, 2002, when the case was first filed, and July 28, 2003, when the arbitration hearing occurred. Thus, the Court rejects B–S Steel's suggestion that the award be vacated due to fraud.

### 3. The Arbitrators were Partial to Midlothian

B–S Steel next suggests that the arbitration award must be vacated because the arbitrators were improperly impartial to Midlothian. As evidence of impartiality, B–S Steel notes that the arbitrators failed to award it damages for its fraud or Texas Deceptive Trade Practices Act claims, "sua sponte bicker[ed] with B–S Steel's damage expert," and made other "derogatory and/or loaded remarks" during the arbitration.

██ Pursuant to 9 U.S.C. § 10(a)(1), an arbitration award may be vacated when "there was evident partiality or corruption in the arbitrators." Evident partiality requires something more than the appearance of bias, but literal proof of bias is not required either.[38] To set aside an award,

---

**33.** *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (A federal court sitting in diversity, or the arbitrators in this case, apply the choice of law rules of the forum state).

**34.** *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420–21 (Tex.1984).

**35.** 9 U.S.C. § 10(a)(1).

**36.** *Foster v. Turley*, 808 F.2d 38, 42 (10th Cir.1986).

**37.** *Id.*

**38.** *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 83–84 (2d Cir.1984); *Peoples Sec. Life Ins. v. Monumental Life Ins. Co.*, 991 F.2d 141, 146 (4th Cir.1993); *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 325 (6th Cir.1998).

the evidence of bias or interest of an arbitrator must be direct, definite and capable of demonstration rather than remote, uncertain or speculative.[39] "[E]vident partiality will be found where a reasonable person would have to conclude that the arbitrators were partial to one party to the arbitration." [40]

■ B–S Steel has failed to demonstrate that the arbitrators acted with "evident partiality." B–S Steel's complaint that the arbitrators failed to award certain damages is not evidence of bias; rather it is simply an attack on the validity of the arbitration award.[41] Nor do B–S Steel's other complaints demonstrate impartiality. Essentially B–S Steel claims that the arbitrators were rude, but rudeness is not a basis to vacate an arbitration award.[42] B–S Steel has failed to show that a reasonable person would have to conclude that the arbitrators were partial to Midlothian.

### 4. The Arbitration Process was Fundamentally Unfair

B–S Steel suggests that, by excluding certain evidence, the arbitrators stripped it of a fundamentally fair hearing. Specifically, B–S Steel complains that the exclusion of Exhibit 570 created such an unfair

hearing that the arbitration award must be vacated. B–S Steel states that the exclusion was "tantamount to denying B–S Steel's antitrust claim," and if Exhibit 570 had been admitted, "even the arbitrators would have been forced to find that B–S Steel was harmed by the illegal discounts . . . ." .

■ Absent a fundamentally fair hearing, an arbitration award may be set aside.[43] The Tenth Circuit has outlined what constitutes a fundamentally fair hearing: "[t]he courts seem to agree that a fundamentally fair hearing requires only notice, opportunity to be heard and to present relevant and material evidence and argument before the decisionmakers, and that the decisionmakers are not infected with bias." [44] Thus, every exclusion of relevant evidence does not require vacatur of an arbitration award.[45] Vacatur is only required when the refusal to consider the proffered evidence "so affects the rights of the party" so as to deny a fair hearing.[46] Neither the arbitrators refusal to admit cumulative or irrelevant evidence provides a basis to set aside an arbitration award.[47]

The exclusion of Exhibit 570 did not deny B–S Steel a fair hearing. The arbi-

**39.** Ormsbee Dev. Co., v. Grace, 668 F.2d 1140, 1147 (10th Cir.1982) (citing Tamari v. Bache Halsey Stuart Inc., 619 F.2d 1196 (7th Cir. 1980)).

**40.** Morelite, 748 F.2d at 84; Andersons, 166 F.3d at 325.

**41.** See Andersons, 166 F.3d at 330 (An adverse award, in and of itself, is not evidence of arbitrator bias absent some evidence of improper motivation).

**42.** See Fairchild & Co. v. Richmond, F. & P.R. Co., 516 F.Supp. 1305, 1313 (D.D.C.1981) (Absent some sort of overt misconduct, a disappointed party's perception of rudeness on part of an arbitrator is not the sort of evident partiality contemplated by FAA as grounds for vacating an award).

**43.** Denver & Rio Grande W. R.R. Co. v. Union Pac. R.R. Co., 119 F.3d 847, 849 (10th Cir. 1997).

**44.** Bowles Fin. Group, Inc. v. Stifel, Nicolaus & Co., 22 F.3d 1010, 1013 (10th Cir.1994).

**45.** Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co., 397 F.2d 594, 599 (3d Cir.), cert. denied, 393 U.S. 954, 89 S.Ct. 378, 21 L.Ed.2d 365 (1968).

**46.** Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901, 763 F.2d 34, 40 (1st Cir.1985).

**47.** Id.

trators excluded Exhibit 570 because B–S Steel missed the deadline for filing exhibits, and the arbitrators had "a problem allowing this document in at this late stage of the game." Absent self-serving argument as to the importance of Exhibit 570, B–S Steel has not demonstrated that the exclusion of a single exhibit deprived it of a fundamentally fair hearing, particularly in light of the large amount of evidence presented to the arbitrators.[48] If Exhibit 570 was indeed so pivotal that its exclusion resulted in an unfair hearing, how could B–S Steel have missed the deadline for filing such a key exhibit? Far from working an injustice upon B–S Steel, the arbitrators' admission of Exhibit 570, in violation of clearly established deadlines, would have worked an injustice upon Midlothian. In sum, B–S Steel has fallen far short of satisfying its burden that it was denied a fundamentally fair hearing.

## III. Conclusion

A primary purpose behind arbitration agreements is to avoid the expense and delay of court proceedings.[49] If an arbitration award is not vacated, modified, or corrected, it must be confirmed.[50] B–S Steel has not demonstrated that any statutory basis exists for vacating the arbitration award. Nor has B–S Steel convinced the Court that application of a limited judicial exception to set aside the award is proper. Consequently, the Court must confirm the arbitration award.

**IT IS THEREFORE ORDERED BY THE COURT** that Midlothian's Petition for Order Confirming Arbitration Award (Doc. 1) originally filed in Case No. 03–

2664, which has been consolidated with Case No. 01–2410, shall be GRANTED.

**IT IS FURTHER ORDERED BY THE COURT** that B–S Steel's Motion to Vacate the Arbitration Award (Doc 1) in Case No. 04–4053 shall be DENIED, and Case No. 04–4053 shall be dismissed.

**IT IS SO ORDERED.**

---

**48.** *See, e.g., Bad Ass Coffee Co. of Hawaii v. Bad Ass Coffee Ltd. P'ship*, 25 Fed.Appx. 738, 743, 2001 WL 1334377 at *3 (10th Cir.2001) (holding that the exclusion of one piece of evidence did not deprive a party of a fundamentally unfair hearing).

**49.** *ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1463 (10th Cir.1995).

**50.** 9 U.S.C. § 9; *P & P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 870 (10th Cir.1999).